Firm E-Mail Address:  courtdocs@dickinsonwright.com

David N. Ferrucci (#027423)
dferrucci@dickinsonwright.com
Jonathan S. Batchelor (#026882)
jbatchelor@dickinsonwright.com
David G. Bray (#014346)
dbray@dickinsonwright.com
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Telephone: (602) 285-5000
Facsimile: (602) 285-5100

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| James J. Aboltin, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>Jeunesse, LLC aka Jeunesse Global, Inc., a Florida limited liability company, Wendy R. Lewis, an individual, Ogale "Randy" Ray, an individual, Scott A. Lewis, an individual, Kim Hui, an individual, Jason Caramanis, an individual, Alex Morton, an individual, John and Jane Does 1-100, individual natural persons, and ABC Corporations, Companies, and/or Partnerships 1-20,<br><br>        Defendants. | Case No.  _____<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION** |

Plaintiff, James J. Aboltin ("Plaintiff"), by and through undersigned counsel, on behalf of himself and all others similarly situated, for their Complaint against Jeunesse LLC, Wendy Lewis, Randy Ray, Scott Lewis, Kim Hui, Jason Caramanis, and Alex Morton, hereby allege as follows:

**I.**

**INTRODUCTION**

1.      This is an action on behalf of Plaintiff James J. Aboltin, for himself and those similarly situated, to recover damages caused by the Defendants,' and their Diamond Director co-conspirators' operation of an inherently fraudulent pyramid scheme.   The pyramid scheme is fraudulent because it requires the payment by participants of money to defendant Jeunesse LLC ("Jeunesse") and its co-conspirators, Wendy Lewis, Randy Ray, Scott A. Lewis, Kim Hui, Jason Caramanis, Alex Morton (collectively "Defendants"), and unnamed Diamond Director co-conspirators, in return for which participants receive (1) the right to sell products, and (2) the right to receive, in return for recruiting other participants into the pyramid, rewards that are unrelated to the sale of Jeunesse products to ultimate end users.

2.      This action is brought pursuant to the Racketeer Influence and Corrupt Organizations Act, 18 U.S.C. 1961, *et. seq.*, ("RICO") and the Arizona Consumer Fraud Act, A.R.S. §§ 44-1521, *et seq.*, on behalf of a class of persons who serve or have served as independent representatives for Jeunesse.

**II.**

**THE PARTIES**

3.      Plaintiff James J. Aboltin was (at all times relevant to the allegations in this complaint) a resident of the State of Arizona, and a citizen of the United States.  Plaintiff was deceived by Jeunesse's misleading business opportunity, falsely believing that it was a legitimate way to earn money, and did lose money as a result of Defendants' unfair, unlawful, and fraudulent business practices.

4.      Jeunesse is a Florida limited liability company, with its principal place of business located at 650 Douglas Avenue, Suite 1020, Altamonte Springs, Florida 32714. Jeunesse began operating in 2009.  Jeunesse is a global pyramid scheme disguised as a multi-

level marketing company that purports to provide an array of purported youth enhancing skin care products and dietary supplements to customers.

5. Ogale "Randy" Ray is a Florida resident and is a manager for, and co-founder of, Jeunesse.

6. Wendy R. Lewis is a Florida resident and is a manager for, and co-founder of, Jeunesse.

7. Alex Morton is an Arizona resident, and a "Diamond" director co-conspirator, and upon information and belief, a recipient of an endorsement deal that was never properly disclosed, who conspired to lure people into the Jeunesse scheme, including many Arizona residents.

8. Scott A. Lewis is a Florida resident and is the Chief Visionary Officer for Jeunesse.

9. Jason Caramanis is a resident of California and an Imperial Diamond Director in Jeunesse.

10. Kim Hui is a resident of California and Double Diamond Director in Jeunesse.

### III.

### CONSPIRACY, AGENCY, JOINT VENTURE, ALTER EGO

8. Each of the Defendants named herein acted as a co-conspirator, agent, single enterprise, joint venturer, or alter ego of, or for, the other Defendants, with respect to the acts, violations, and common course of conduct alleged herein, and ratified said conduct, aided and abetted, or is otherwise liable. Defendants have had meetings with other Defendants, and unnamed Diamond Director co-conspirators and have reached agreements to market and promote the Jeunesse Pyramid as alleged herein.

9. Defendants, along with unnamed Diamond Director co-conspirators, were part of the leadership team that participated with Jeunesse, and made decisions regarding:

1   products, services, marketing strategy, compensation plans (both public and secret),

2   incentives, contests, and other matters.  In addition, Defendants and unnamed co-conspirators

3   were directly and actively involved in decisions to develop and amend the distributor

4   agreements and compensation plans.

5        10.    John and Jane Does 1-100 are fictitious names for individual co-conspirators

6   within the Jeunesse scheme, who profited from the scheme, and/or who received the proceeds

7   from that scheme, but whose identities and involvement are not yet known to plaintiffs.

8        11.    ABC Corporations, ABC Companies, and ABC Partnerships 1-20 are fictitious

9   names for legal entities who participated in the scheme, and or received the proceeds from

10  that scheme, but whose identities and involvement are not yet known to plaintiffs.

11       12.    The acts charged in this Complaint, as having been done by Defendants, were

12  authorized, ordered, ratified or done by their officers, agents, employees, or representatives –

13  while actively engaged in the management of the Defendants' businesses or affairs.

14                                    **IV.**

15                       **JURISDICTION AND VENUE**

16       13.    Defendants are subject to the jurisdiction of this Court.  Corporate Defendant

17  Jeunesse, at all relevant times, has been engaged in continuous and systematic business in

18  Arizona, and/or has committed tortious and fraudulent acts in Arizona that have caused

19  damages to residents of Arizona.  The individual Defendants have, at all relevant times, also

20  been engaged in continuous and systemic business in Arizona and/or have committed tortious

21  acts in Arizona that have damaged residents of Arizona.

22       14.    The actions giving rise to this lawsuit were taken by Defendants, at least in part,

23  in Arizona.  Plaintiff is a resident of Arizona.  In accordance with 18 U.S.C. § 1965(a) and

24  (b), the Defendants are subject to this Court's jurisdiction in that they "transact affairs" in

25  Arizona and "the ends of justice require that [they] …. be brought before the Court[.]  *See*

26  U.S.C. § 1965[a] and [b]).

                                        4

15.     This Court has personal jurisdiction over defendants pursuant to U.S.C. § 1965[b], "the Court may cause such parties to be summoned, and process for the purpose may be served in any judicial district of the United States by the marshal thereof." (U.S.C. § 1965[a] and [b]).  Defendants are also subject to the jurisdiction of this Court pursuant to Arizona's long-arm statute, Ariz. R. Civ. P. 4.2(a), made applicable by Rule 4(e) of the Federal Rules of Civil Procedure.

16.     Because Plaintiff asserts claims pursuant to the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, this Court has jurisdiction over this action, pursuant to 28 U.S.C. §1331.  Because Plaintiff asserts state-law claims under A.R.S. §§ 44-1521, *et. seq.*, this Court may exercise supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

17.     Venue is proper in this District, pursuant to 28 § 1391(b) and (c) and 18 § 1965(a) and (b), because a substantial number of the acts and transactions that precipitated Plaintiff's claims (and the claims of the classes) occurred within this District.  Defendants did (or solicited) business, and transmitted communications by mail or wire, relating to their illegal pyramid, in this district; transacted their affairs, in this judicial-district; and committed wrongful acts in this district, which have directly impacted the general public (of this district), and the ends of justice do require that parties residing in other districts be brought before this Court.

## V.

## GENERAL ALLEGATIONS

### A.     The Nature of Pyramid Schemes.

18.     Although pyramid schemes can take various forms, they are at their core inherently illegal schemes, by which perpetrators induce others to join, with the promise of profits and rewards from a putative business. The reality of the schemes, however, is that

5

rewards to those that join come almost exclusively from the recruitment of new participants/victims to the scheme.

19.     "Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'" *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) (quoting *In re KoscotInterplanetary, Inc.,* 86 F.T.C. 1106, 1181 (1975)), affd mem. sub nom., *Turner* v. *FTC.,* 580 F.2d 701 (D.C. Cir. 1978)).  As such, "[p]yramid schemes are-said to be inherently fraudulent[.]"  79 F.3d at 781.

20.     Pyramid schemes are characterized as: "the payment by Associates of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other Associates into the program rewards which are unrelated to sale of the product to ultimate users." *Omnitrition¸* 79 F.3d at 781 (*quoting Koscot¸* 86 F.T.C. at 1180); *FTC* v. *Burnlounge, Inc.,* 753 F.3d 878, 880 (9th Cir. 2014).

21.     According to the Ninth Circuit, the satisfaction of the second element of the *Koscot* test is the *sine qua non* of pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed." *Omnitrition*, 79 F.3d  at 782.

22.     The Ninth Circuit has adopted the *Koscot* standard and has held that "the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes." *Omnitrition*, 79 F.3d at 782; *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 880 (9th Cir. 2014).

23.     Arizona law also renders pyramid schemes illegal.  Arizona law defines a pyramid scheme as follows:

> "Pyramid promotional scheme" means any plan or operation by which a participant gives consideration for the opportunity to receive

6

compensation which is derived primarily from any person's introduction of other persons into participation in the plan or operation rather than from the sale of goods, services or intangible property by the participant or other persons introduced into the plan or operation.

Ariz. Rev. Stat. Ann. § 44-1731.

24.     The presence of other terms does not change the identity of the scheme:

A limitation as to the number of persons who may participate or the presence of additional conditions affecting eligibility for the opportunity to receive compensation under the plan or operation does not change the identity of the scheme as a pyramid promotional scheme nor is it a defense under this article that a participant, on giving consideration, obtains any goods, services or intangible property in addition to the right to receive compensation.

Ariz. Rev. Stat. Ann. § 44-1735(B).

25.     On October 19, 2015, TruthInAdvertising.org ("TINA") sent a letter to the Federal Trade Commission ("FTC") informing the FTC of the results of TINA's investigation into Jeunesse's illegal pyramid scheme.  [*See* TINA Letter to FTC, attached hereto as Exhibit A].

26.     Among other findings, TINA's investigation revealed the following:

- "TINA.org's investigation revealed a host of issues, including, among other things, an emphasis on recruitment over product sales, and claims made by the company, as well as its medical advisory board, that its products can manipulate human genes and cells to slow the aging process."

- "TINA.org found that Jeunesse and its distributors are using deceptive income claims regarding the financial gains consumers will achieve by becoming distributors. For example, Jeunesse advertises that those who sign-up for its business opportunity can make over $26,000 per week. Its distributors also make unrealistic financial promises, such as being able to make millions of dollars per year. The problem is that the vast majority of these income claims contain no disclosure, let alone a legally appropriate one. TINA.org has compiled over 60 instances of these types of income claims, which are all available at https://www.truthinadvertising.org/jeunesse-income-claims-database/."

- "Based on this information, we contacted the company on September 25, 2015 notifying it of TINA.org's findings of inappropriate income and health claims made by Jeunesse and/or its distributors, and asked that the company remedy the deceptive marketing immediately.   While the company admitted that 'misrepresentations of the kind that [TINA.org] allege[s] clearly are prohibited by our rules of conduct' and indicated that it 'is in the process of adding new fulltime employees to the compliance group in the coming weeks,' over three weeks have past[sic] since TINA.org's initial warning and the majority of examples of deceptive health and income claims published in our databases – including marketing materials created by the company itself – are still up on the Internet.'"

27.     Randy Ray, Chief Executive Officer, Jeunesse, and Greg Hogenmiller, Deputy General Counsel, Jeunesse, were copied on TINA's letter to the FTC.

28.     Upon information and belief, Jeunesse has taken no action to remedy the violations uncovered by TINA.

29.     Pyramid schemes that masquerade as legitimate multi-level marketing ("MLM") companies soil the reputation of the MLM industry.   Rogue companies like Jeunesse give legitimate operators a bad name.   In response, the FTC has been taking more aggressive steps and actions against those rogue actors, and shutting down their unlawful business operations. For example, in 2007, the FTC took action against Burnlounge Inc., for operating a pyramid scheme in violation of Section 5(a) of the FTC Act.   Burnlounge was offering its associates the opportunity to participate in cash rewards in exchange for an initial fee, plus recurring monthly fees.   Members were paid automatic signup bonuses for selling higher priced packages to new associates.   The matter was heavily litigated, and ultimately reached the Ninth Circuit Court of Appeals.   *See F.T.C.* v. *BurnLounge, Inc., 753* F.3d 878 (9th Cir. 2014). The Ninth Circuit rendered its opinion in 2014, finding that BurnLounge's business model focused on recruitment, and that the rewards paid, in the form of cash bonuses, were primarily earned for recruitment, as opposed to merchandise sales to consumers. *Id. at* 886.  The court placed an emphasis on the fact that recruiting was built into

the compensation structure, in that recruiting led to eligibility for cash rewards, and the more recruiting the higher the rewards. *Id*. at 884. Thus, the court found BurnLounge's focus was on promoting the bonus and commission program rather than selling the company's products to end retail users. *Id*.

30.     On August 1, 2015, the FTC took action against VEMMA and alleged that it was a pyramid scheme based on representations made in promotional videos, in which representatives discussed its compensation model and alleged income opportunities. VEMMA used a binary-based compensation model almost identical to the one at issue in this case. Like Jeunesse's binary compensation plan, VEMMA affiliates earned financial rewards for building two teams of affiliates, who were then charged with recruiting additional affiliates. The FTC is arguing that the emphasis of VEMMA's sales culture is recruitment, thus the ***product is merely incidental to the business opportunity***.

### B.     Defendants' Enterprise Constitutes a Pyramid Scheme.

31.     Jeunesse has at least two separate compensation plans—a public compensation plan (the "Public Compensation Plan") and a private compensation plan involving secret, undisclosed backroom deals offered to those believed to be "quality" recruits, typically top earners in other network marketing companies with established downlines (the "Secret Compensation Plan"). Both compensation plans further Jeunesse's operation of an illegal pyramid scheme because both plans revolve around recruitment. A distributor's compensation is derived from successfully recruiting new distributors (not product sales to ultimate end users), or, as in the case of the undisclosed, Secret Compensation Plan, luring and importing entire downlines or "teams" from other network marketing companies.

32.     Defendants have operated and promoted their fraudulent schemes throughout the United States through the use of the U.S. mail and interstate wire communications. Through their creation and operation of their pyramid scheme, Defendants specifically

1   intended to, and did in fact, defraud their distributors — including Plaintiff and the members

2   of the Class.

3         **C.**     **The Jeunesse Public Compensation Plan.**

4        33.    Jeunesse's public compensation plan is referred to as a "Binary" plan.  In this

5   plan, participants are required to build two separate organizations ("legs"), where participants

6   derive compensation based off of a percentage of volume generated from their downline.

7        34.    At the bottom rung of this operation is a network of so-called Distributors.

8   Juenesse purports to sell its products through the Distributors, but, in fact, few of Jeunesse

9   products are ever sold to anyone other than its Distributors.  Because its Distributors are the

10  actual customers and ultimate users of its products, Jeunesse requires an ever-expanding

11  network of new Distributors in order to keep the pyramid scheme running.

12       35.    Under the Jeunesse Public Compensation Plan, Distributors are able to earn

13  income primarily from two sources: (1) bonuses for recruiting and sponsoring new

14  representatives, and (2) commissions from sales of products and services to themselves and to

15  the recruits in their "downline," including a 20% "Check Match" on all commissions received

16  by personally sponsored distributors.

17       36.    The term "Downline" is commonly used to represent a cluster of people in a

18  participant's organization.

19       37.    Jeunesse operates as an illegal pyramid scheme in part because its Public

20  Compensation Plan revolves around a recruitment-oriented message, in which a Distributor's

21  compensation derives from successful recruitment of new distributors.  "Courts . . . have

22  consistently found MLM businesses to be illegal pyramids where their focus was on

23  recruitment and where rewards were paid in exchange for recruiting others, rather than simply

24  selling products."  *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 885 (9th Cir. 2014).  A

25  Distributor receives rewards which are unrelated to the sale of products or services to ultimate

26  users outside of the Jeunesse pyramid.  *See United States v. Gold*, 177 F.3d 472, 480 (6th Cir

1999) (*quoting In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1187 (1975)).  Such a scheme is deemed inherently fraudulent under federal and Arizona law.

38.  New entrants into this pyramid scheme are effectively required to make a minimum initial investment from $249.90 up to $1,849.90, by paying a $49.95 startup fee, and purchasing at least the $199.95 Basic Product Package (if not the $1,799.95 Jumbo Package).  All of the exorbitant costs are paid in order to stay "Active" and "Qualified," which is necessary to be compensated under the scheme.

39.  Because Jeunesse's Distributors essentially do not sell products to consumers (who are not also distributors), they only obtain return on their investment by recruiting new distributors (who then buy products).  This results in payouts alleged to be "bonuses" and "commissions."   When a company incentivizes the recruitment of new participants over product sales, rewards to participants are not considered sales to ultimate users.  *BurnLounge*, 753 at 887; *see United States v. Gold*, 177 F.3d 472, 481 (6th Cir 1999).

40.  Jeunesse is a classic pyramid scheme with charismatic leaders/founders at the top of its enterprise.  In this case, Defendants Lewis and Ray are those leaders.  Defendants Lewis and Ray are supported by various businesses and individuals (usually high ranking representatives of the company), such as the other individual Defendants, and unnamed Diamond Director co-conspirators, who disseminate its marketing materials, and promote the scheme to individuals through seminars, promotional videos, and websites.  These conspirators instruct other "liked-minded" individuals to duplicate their "system" as soon as possible, to further the conspiracy.

41.  In sum, Jeunesse's emphasis on selling product packages to recruits is not based upon real consumer demand for its products, but instead by the new recruit's desire to earn greater commissions and bonuses under the Jeunesse Public Compensation Plan.

42.    From its inception in 2009, Jeunesse has utilized a compensation-plan document that describes a compensation structure that amounts to a fraudulent and illegal pyramid scheme, both by its very terms, and by its implementation in practice.

43.    Defendants recruit new victims into the Jeunesse pyramid scheme by offering them the opportunity to become "Jeunesse distributors."

44.    To become a Jeunesse distributor a participant is required to purchase "the mandatory $49.95 Starter Kit." [*See* Jeunesse Opportunity Plan, attached hereto as Exhibit B].

45.    According to Diamond Director Steve Green, with the purchase of the $49.95 Starter Kit, "you get to plug into a *bona fide* billion dollar world-wide platform.  You can build an international business from your living room, for $49.95.  It's a steal, right?"[1]

46.    In addition to paying the one-time $49.95 start-up fee, the new Jeunesse Distributor is then encouraged to join as an "Active" distributor.

47.    The new distributor becomes "active" by selecting a product package from the company ranging in price from $199 to $1,799.00.  The product packages contain a mixture of various Jeunesse products.

48.    New distributors are strongly encouraged to purchase one of the more expensive product packages.  These initial product purchases, after all, generate the funds that fuel the Jeunesse pyramid scheme.  With regard to the initial product package purchase, Defendants tell new and prospective distributors:  "The more you spend, the more you get.  And is inventory an advantage in our business?  Yes!"[2]

49.    In reality, a new distributor's only hope of recouping his or her money is to recruit new victims for the scheme.

50.    When a Jeunesse distributor recruits a new individual into his or her downline, and the new individual "activates" by purchasing a Jeunesse product package, the distributor

---

[1] https://www.youtube.com/watch?v=FDKUR_q-nu0

[2] https://www.youtube.com/watch?v=FDKUR_q-nu0

who enrolled the new individual into his downline receives a "Customer Acquisition Bonus" ranging from $25 to $250, depending on the price of the product package purchased.

51.     When a Jeunesse distributor recruits a new distributor who purchases a product package, the following recruitment commissions are paid out:

- Basic Package ($199.95) – $25 commission

- Supreme Package ($499.95) – $100 commission

- Jumbo Package ($799.95) – $200 commission

- 1-Year Jumbo Package ($1799.95) – $200 commission

- Ambassador Package ($1099.95) – $250 commission

These bonuses are paid regardless of whether any Jeunesse product is sold to ultimate end-users outside the distribution channel.   As one Jeunesse recruitment video states:   "These bonuses are paid when you introduce a new distributor who goes on to purchase one of the Jeunesse Product packages when they get started."[3]

52.     To earn such recruitment commissions, there is no requirement that any Jeunesse product be sold outside the distribution channel.

53.     After the new distributor "activates" by purchasing a Jeunesse product package, new distributors are told they then need to "qualify" to earn "team commissions."   As the Jeunesse Public Compensation Plan provides:

> In order to qualify for this powerful income stream, you need to accumulate 100 Personal Volume (PV) points in one month during the first year (which ends on your renewal date) from your customer's purchases through your website or your personal purchases and personally enroll two Distributors who each accumulate 100 PV within one month.   Place one of these Distributors on your left team and one on your right team.   This will activate your position so that you may now be eligible to earn Team Commissions.

*See* Opportunity (Ex. B).

_____

[3] https://www.youtube.com/watch?v=oObOn1uLOnI

13

54.     Purchases of product packages by Distributors and new recruits generate particular "commissionable volume" point values ("CV"), as follows:

- Basic Package                    100 (CV)
- Supreme Package             300 (CV)
- Jumbo Package                 400 (CV)
- 1 Year Jumbo Package     500 (CV)

55.     When a distributor recruits two new victims, places them on the left and right side of the binary and then "activates" those new individuals, the Distributor becomes an "Executive."  Defendants tell new and potential distributors:

> Think of the Executive as the brick in the Jeunesse house you are going to build.  And the more executives you create in your organization, the bigger your Jeunesse house and the more money you are going to make … Create 'Executives.'  That's the game here.  You create 'Executives.'"[4]

56.     To "create executives" there is no requirement that any Jeunesse product be sold to any customer outside the distribution channel.

57.     Jeunesse Distributors are rewarded for enrolling new victims into Jeunesse and encouraging those new distributors to "activate" by purchasing a product package.  Each product package is assigned a point level based on the overall cost of the package.  Based on the accumulation of such points in the distributor's downline a distributor is eligible to earn team commissions.  As one Jeunesse recruitment video explains:

> Every product and product package has a point total attached to it known as a commissionable volume or CV…. When 300 CV have been accumulated in one team (it doesn't matter which one) and 600 CV points in the other you will earn a team commission of $35.00 and you keep earning 35.00 every time this happens….So as your team grows, you will receive 35 dollar bonuses over and over again.  And the most amazing thing is this can happen up to 750 times each week!  Meaning you could earn up to $26,250 in just seven days.[5]

---

[4] https://www.youtube.com/watch?v=FDKUR_q-nu0

[5] https://www.youtube.com/watch?v=oObOn1uLOnI

58.     New recruits are told that it is easy to earn such commissions under the Jeunesse Public Compensation Plan:

> The real key to building your business and developing a sizable monthly income with Jeunesse is to build your sales team….The more people you encourage to join and the more you help them succeed the more you earn…. And don't worry, ***its easy***.  All you need to do is accumulate 100 Personal Volume or PV points in one month and enroll two distributors, one on your left team and one on your right who have each generated 100 personal volume points in one month during the first year of joining.  Once you've qualified as an executive, its time to start building your two teams so that your business starts to grow and you're eligible for more and more commissions.[6]

59.     The opportunity to earn commissions and residual income for life is the main selling point of the Jeunesse "business opportunity."  Team Commissions are paid out using a binary compensation structure:  the recruiting distributor is at the top, and his two subsequent recruits (who have purchased product packages) are each placed in one of the two left/right binary legs.  Once one leg reflects a minimum of 300 CV points and the other leg reflects a minimum of 600 CV points, a distributor earns a $35 payout.  The Public Compensation Plan states that this can happen up to 750 times in a week for a total of over $26,000 in team commissions.  *See* Opportunity (Ex. B).

60.     To lure recruits into the Jeunesse pyramid, Defendants make these specific income claims and then tell potential recruits:

> What if you did ten percent [of $26,000]?  Would that be okay with you?  What if you did ten percent that good?  Could you use an extra $2,600 a week?  Could you?  That's an extra $100,000 a year.  That's life-changing money… Do you know there are people at this company that they're maxing this out every single week?  Do you know this company has paid out 500 billion [sic] dollars in commissions to people like you and me who have been smart enough to align ourselves with this company in front of this global trend of anti-aging demand, and guess where we all are right now, we are in the front of that trend and we're all right now being swept

---

[6] https://www.youtube.com/watch?v=oObOn1uLOnI

15

up into a jet stream of momentum carrying to riches…And it starts with team building.[7]

61.     The basis for promoting Distributors to higher positions in the Jeunesse Pyramid is not success in selling products to customers outside the distribution channel, but rather the recruitment and sponsorship of new distributors—those in his or her "downline." There are 14 ranks in the Public Compensation Plan of the Jeunesse pyramid.  The ranks are based upon a distributor's ability to recruit new distributors, and the ranks dictate earning rates of the distributors.  The ranks, along with their respective qualification criteria, are as follows:

- Associate (no MLM) – sign up as a Jeunesse affiliate (minimum $49.95)

- Distributor – generate 100 PV within a 30 day period

- Executive – maintain 60 PV a month and recruit 2 Distributors

- Jade Executive – maintain 60 PV a month and recruit and maintain 4 Executives or 8 Distributors

- Pearl Executive – maintain 60 PV a month and recruit and maintain 8 Executives or 12 Distributors

- Sapphire Executive – maintain 60 PV a month and recruit and maintain 12 Executives

- Sapphire Elite – maintain 60 PV a month and Sapphire Executive qualification, in addition to earning at least 60 binary commissions the previous month (an ongoing requirement)

- Ruby Director – maintain 60 PV a month, have at least two Sapphire qualified legs and have earned at least 200 binary commissions the previous month

- Emerald Director – maintain 60 PV a month, have at least four Sapphire qualified legs and have earned at least 500 binary commissions the previous month

- Diamond Director – maintain 60 PV a month, have at least six Sapphire qualified legs and have earned at least 1000 binary commissions the previous month

---

[7] https://www.youtube.com/watch?v=FDKUR_q-nu0

- Double Diamond Director – maintain 60 PV a month, have at least two Diamond Director legs and have earned at least 1500 binary commissions the previous month

- Triple Diamond Director – maintain 60 PV a month, maintain a downline of at least 10,000 affiliates on autoship, have at least four Diamond legs and generate at least 2,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment line)

- Presidential Diamond Director – maintain 60 PV a month, maintain a downline of at least 15,000 affiliates on autoship, have at least six Diamond legs and generate at least 3,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment line)

- Imperial Diamond Director – maintain 60 PV a month, maintain a downline of at least 20,000 affiliates on autoship, have at least eight Diamond legs and generate at least 4,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment leg)

62.     Defendants recruit victims, and induce them to purchase product packages through false material statements and omissions and then distribute proceeds from these sales, at rates based almost exclusively on participants' recruitment of new victims—rather than on the sale of products to customers outside the distribution channel.  Diamond Director Co-conspirators and the Defendants then siphon off 3% of the total global revenue from Jeunesse to further enrich themselves.

63.     As a result of investing in the scheme, Plaintiff and the Class have suffered losses in the hundreds of millions of dollars.

64.     Jeunesse relies on the promise of Team Commissions and "residual" or "passive" income for life to lure new distributors into their pyramid scheme.  In practice, Jeunesse accomplishes this goal by having Distributors buy products and monthly packages, and recruit other new distributors to do the same.

65.     Jeunesse Distributors are strongly encouraged to purchase one of the more expensive product packages.

66.     The document entitled "The Gameplan" included in the Jeunesse Starter Kit states:  "Your first 48 hours to 7 days is crucial—***what you do now*** will determine your success in the future."  (emphasis in original). [*See* Jeunesse Gameplan, attached hereto as Exhibit C].

67.     Jeunesse emphasizes such urgency because it wants the new distributors to become active, qualified, purchase product packages, sign up for the Jeunesse Autoship Program, and introduce others to the business before the excitement generated by the initial recruitment pitch wears off and the new recruit quits, which generally occurs within a week or two.

68.     The Gameplan (Ex. C) urges new distributors to choose one of the larger packages.  As the Gameplan explains:

> "The majority of Distributors choose the larger packages for these key reasons:
>
> a.     You will accumulate the 100 PV (Personal Volume) required to qualify as a Distributor.
> b.     You will need to use the products in order to speak about their effectiveness.
> c.     You will need to share your products with people so they will try them.
> d.     Your team will do what you do.  If you are using the products and giving out the products for others to try, your team will duplicate your actions.
> e.     You will be paid at a higher rank for a temporary period, during which you will be eligible to receive the Leadership Matching Bonus.

69.     As Jeunesse Diamond Director Bekki Hurley states in a "start-up" video:

> If you are coming in looking at this as a business opportunity I am going to recommend that you go in with one of the higher packages just because you are going to have some products on hand … and the total price is going to be an income tax right off for you[.][8]

---

[8] https://www.youtube.com/watch?v=O9jmy5FlmkI

70.    In order to qualify for commissions in Jeunesse, each affiliate must generate in sales or purchase 100 PV in products within a single month.  Thereafter in order to remain commission qualified, each affiliate must maintain 60 PV (Personal Volume) in product volume each month.  Thus, to receive any commissions with Jeunesse, a distributor must make at least an initial purchase of a product package, and then continually purchase product packages on a monthly basis regardless of consumer need.

71.    In order for a distributor to maintain 60 Personal Volume points each month and in order to remain qualified for commissions, Jeunesse strongly encourages that each distributor receive their monthly product packages under the Jeunesse Autoship Program.

72.    In the "Gameplan" guide, once a product package has been purchased, the next highly recommended step is to immediately enroll in the Jeunesse Autoship program, which will ensure ongoing eligibility for compensation.  As the Gameplan (Ex. C) explains:

> This will ensure you always have the product you need to build your business on a monthly basis.  It will also secure the minimum Commissionable Volume.  Distributors who are serious about building a residual income immediately enroll in Autoship.

73.    As another video states:

> The whole purpose of this business is to earn residual income; you can't do that unless you have your Autoship set up for yourself and you get the people who enroll in your business to set up Autoship and you do this on the day that you enroll them.[9]

74.    As one Jeunesse team's Facebook page states:

> For those of you new to the business, Autoship is a must when setting anyone up with Jeunesse. Autoship is the bloodline of the business and without your people on Autoship your business will take so much longer to grow and your success will be limited…. Don't short change your business and ensure that you and everyone in your downline benefits from a strong and healthy Autoship program. Your new distributors will follow what you

---

[9] https://www.youtube.com/watch?v=ZAIjMRgWmmo

do. If you don't put them on Autoship, they won't put their people on either and so on and so on.[10]

75.    As another incentive for signing up for Autoship, Jeunesse promises that if a Distributor maintains Autoship, they do not have to pay annual affiliate fees.

76.    In sum, the Autoship Program is a centerpiece of the Jeunesse Public Compensation Plan.  The purchase of product packages by Jeunesse Distributors generate the profits that go to those at the top of the Jeunesse Pyramid.  The Jeunesse Autoship Program, and the 60 PV monthly requirement, ensures that profits will continue to flow.

77.    Not only are distributors strongly encouraged to Autoship their own products, but they in turn strongly encourage those in their downline to do the same.  In fact, to reach the highest levels of the Public Compensation plan, a distributor must have thousands of distributors in their downline on the Jeunesse Autoship Program:

> Triple Diamond Director – maintain 60 PV a month, **maintain a downline of at least 10,000 affiliates on autoship**, have at least four Diamond legs and generate at least 2,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment line)

> Presidential Diamond Director – maintain 60 PV a month, **maintain a downline of at least 15,000 affiliates on autoship**, have at least six Diamond legs and generate at least 3,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment line)

> Imperial Diamond Director – maintain 60 PV a month, **maintain a downline of at least 20,000 affiliates on autoship**, have at least eight Diamond legs and generate at least 4,000,000 CV a month in downline sales volume (no more than 500,000 CV from any one recruitment leg)

78.    As shown above, and in the Public Compensation Plan, the CV and binary system of payout is extremely difficult to follow.  This is why Jeunesse emphasizes the power of duplication in its recruiting videos. New distributors are told to follow an eight-step

---

[10] https://www.facebook.com/TeamEpicGlobal/posts/834455059953865

system, which is much easier to do than attempt to navigate Jeunesse's confusing Public Compensation Plan.

79.     At a Google Hangout held on July 14, 2016, Jeunesse leaders explained the eight-step system one needs to follow to be successful in Jeunesse.   Those steps are as follows:

1.     Know your why
2.     Understand your financial goals
3.     Create your list
4.     Contact and Invite
5.     Share the Jeunesse Opportunity
6.     Follow up
7.     Enroll Others
8.     Repeat and teach these steps.[11]

80.     As the Jeunesse leaders explained:  "This is the magic and this is really where the duplication happens."[12]

81.     Not one of those steps involves product sales to consumers outside the distribution channel.

82.     At that same Google Hangout, Diamond Director Joshua Higginbotham discussed a new Jeunesse product, but made no mention of selling the product to customers outside the distribution channel, but instead using it to recruit people; to "re-launch people, go get back in front of people that quit or dropped out."[13]

83.     Higginbotham also made no mention of the Jeunesse secret, inside deals (*i.e.*, business development deals, discussed *infra*).   Instead, he discussed the "simple" things a distributor must do to build a team in Jeunesse.   "There is no way you can build an army of people that are committed to changing their lives" without doing the first three steps of the eight-step system, Higginbotham stated.   As he further explained, "you want to build a massive team of people who are duplicating a system, possibly globally[.]"   To do so, the

[11] https://www.youtube.com/watch?v=a7x8WGm3WRg
[12] https://www.youtube.com/watch?v=a7x8WGm3WRg
[13] https://www.youtube.com/watch?v=a7x8WGm3WRg

distributor must be "all in." "If you want to build a team that's all in, my question to you is are you all in."

84.     Jeunesse leader Katy Holt-Larsen explained that the eight-step system is "so simple… that's the beauty of it, anyone can follow it and get it done."

85.     Double Diamond Director Flora Li urged that you "need to go out right now and get products for yourself and for your team."  Flora Li makes no mention of getting products for the purpose of retail sales.  Instead, the goal of buying product packages is to pitch the business opportunity to others so that one can "build a bigger team, a more successful team."

86.     Jeunesse expends a great deal of effort to demonstrate how simple it is to earn commissions.  New distributors and recruits are told:  "Everyone can do this business."[14]

87.     New and potential distributors are told that to be successful in Jeunesse all you need is "passion."  As stated by Jeunesse Chief Visionary Officer, Scott Lewis:

> "[Jeunesse is] an opportunity to take your life to the next level, not just your business….If you're passionate about the movement we've created, that's all you're going to need.  Follow the steps.  Be passionate….You know what separates these Diamonds from the rest of the people that don't make it to Diamond?  Its how they deal with adversity.  They deal with the same adversity as you, every single day.  But they are resilient in the face of adversity…. All you've got to do is be passionate because passion is absolutely infectious…. Everything is in your hands.[15]

88.     Commissions are paid out for the recruitment of new distributors, and not for sales of products to ultimate users outside the Jeunesse pyramid.

89.     These rewards are illusory, however, as they exist primarily to benefit Defendants and the co-conspirator Diamond Directors, and to lure more victims.  Moving up Jeunesse's ranks is dependent upon bringing in new distributors, who purchase Jeunesse's product packages.   Jeunesse places little, if any, emphasis on product sales to outside

---

[14] https://www.youtube.com/watch?v=sovXkavHe9g
[15] Located on: https://www.facebook.com/JeunesseHQ/

customers, and lacks the procedural safeguards to prevent self-consumption in order to qualify for bonuses.

90.     Defendants emphasize recruitment over product sales and stress the importance of recruiting new recruits into the Jeunesse program.  For example, in a seminar on teaching how to "maximize" the Jeunesse Compensation Plan, Diamond Director Steve Green focused on team building, not retail sales, and stated:  "Everyone knows how to retail a product; that's easy."

91.     Defendant Kim Hui, of Newport Beach, California tells new and potential distributors:

> So the first way to make money is retail commissions, right. You know we as distributors we get the product at wholesale and then when people buy it, they buy it retail . . . so we get a little retail commission. . . . Now that will be the smallest pay you ever get. OK? I forget about retail commissions for me. . . . I'm in this not to sell product. I'm here to build a global distribution. . . . I'm not a salesperson; I'm a business builder.[16]

92.     Defendants direct new and prospective distributors to follow a "team building" system in order to earn money off of the team they are building.  The team building part of the compensation plan "is the core of [the Jeunesse] plan."

93.     Jeunesse does not provide adequate, if any, "safeguard" policies and procedures sufficient to ensure adequate product sales to ultimate end users and to prevent inventory loading.  Such safeguards are necessary, as a structure with insufficient retail sales will inevitably generate a pyramid scheme that relies on ongoing recruitment to fund commission payments.  In *Matter of Amway Corp., Inc.*, 93 F.T.C. 618 (1979), the FTC found that Amway was not operating as a pyramid scheme because it had adopted and enforced certain procedures to prevent inventory loading and to ensure that actual retail sales existed.  As noted in *Omnitrition*, the safeguard "policies adopted by Amway were as follows: (1) participants were required to buy back from any person they recruited any saleable, unsold

---

[16] https://www.youtube.com/watch?v=iA0MSa2tAO8

1  inventory upon the recruit's leaving Amway, (2) every participant was required to sell at
2  wholesale or retail at least 70% of the products bought in a given month in order to receive a
3  bonus for that month, and (3) in order to receive a bonus in a month, each participant was
4  required to submit proof of retail sales made to ten different consumers." *Webster v.*
5  *Omnitrition Int'l, Inc.*, 79 F. 3d 776, 783 (9th Cir. 1996).

6      94.    Jeunesse has a 70% rule within its Policies & Procedures. It states: "In order to
7  qualify for commission and overrides, each distributor must certify with the purchase of
8  product that he/she has sold to retail customers and/or has consumed seventy percent (70%) of
9  all products previously purchased. This is known in the industry as the 'Seventy Percent
10 Rule'." [*See* Jeunesse Policy and Procedures, attached hereto as Exhibit D], § 8.5.

11     95.    Jeunesse's Seventy Percent Rule depends entirely on self-verification and there
12 are no explicit sanctions for a violation. Even if Jeunesse were to take steps to verify this
13 certification, a distributor could meet the terms of the Policy and Procedures by merely
14 consuming the product personally, even if the purchase was motivated by the desire to earn
15 commissions. As such, even if enforced, this rule would not be effective to ensure product
16 sales to individuals outside the distribution network.

17     96.    Jeunesse also has no Amway-like "10 Customer Rule" or similar policy.
18 Jeunesse does not even require that a distributor make any product sales to ultimate
19 consumers outside the distribution channel. Pursuant to the Jeunesse Policies & Procedures:
20 "In order to qualify for any compensation payable under the Jeunesse Rewards plan, a
21 distributor ***should*** make retail sales to the ultimate consumer." Ex. D § 8.6 (emphasis added).

22     97.    Jeunesse has a 1-year return policy for distributors who leave the business. The
23 ability to return product, however, is limited by potential expiration of the product (the
24 product must be in "CURRENT, REUSABLE AND RESALABLE condition") and, more
25 significantly, by the 70% certification assumed in every distributor's purchase. *See* Policies
26

1   and Procedures (Ex. D), § 10.5.  If the purchase itself certifies that 70% will be sold or

2   consumed, ability to return is assumed to be limited by that certification.

3       **D.    The Jeunesse Secret Compensation Plan.**

4       98.    Upon information and belief, most of the income earned by Jeunesse's top

5   earners comes from a secret, non-public compensation plan in form of Business Development

6   Deals ("BDD").  An example of one such deal is attached hereto as Exhibit E.

7       99.    The Jeunesse Business Development Deals are designed to attract top earners in

8   the network marketing industry and lure them (and the downline that they have built in

9   another network marketing company) to Jeunesse and reward them for bringing those teams

10  to, and enrolling them in, Jeunesse.

11      100.   Upon information and belief, one of the rewards for participation in the

12  Jeunesse Secret Compensation Plan is preferential placement in the Jeunesse Genealogy (*i.e.*,

13  the structure of the Jeunesse pyramid).

14      101.   The vast majority of Jeunesse participants do not receive additional

15  compensation for their efforts, nor do they receive preferential placement in the Jeunesse

16  Genealogy.  They are instead required to build a sales organization pursuant to the Public

17  Compensation Plan.

18      102.   The terms of the Juenesse BDDs vary from recipient to recipient.

19      103.   According to Jeunesse's own representatives, Jeunesse's rapid success in the

20  network marketing industry is largely due to these secret BDDs.

21      104.   Not only are such deals not disclosed to the public, but Defendants routinely

22  hold out such deal recipients as having achieved certain levels of success in Jeunesse without

23  disclosing that that success is due to the inside deal, and not by organically building a team

24  from scratch pursuant to the Public Compensation Plan.

25

26

105.   Defendants lure top industry earners to Jeunesse with these inside deals and then the top-earners endorse Jeunesse and induce others to enroll in Jeunesse without disclosing to the public the secret financial arrangement.

106.   In short, Defendants are luring top network marketers from other companies with very lucrative inside deals and those individuals are then enrolling their teams into Jeunesse.  The inside deals are routinely concealed from the public.  They are not disclosed to members of the team being brought over and they are not disclosed when these individuals are being held out by the company as reaching specific earnings levels in record time.

107.   For the "Big Players" in the company, estimated to be about 4-5 individuals, a BDD can be worth up to $100,000 to $200,000 a month.

108.   According to one of the company's top earners (and beneficiary of a BDD) "nobody [in the industry] can compete with it."

109.   Top earning network marketers who have come over to Jeunesse on a BDD, know that the ability to earn the amount of money they are earning on the inside deals is not going to last forever.  Accordingly, at least one such deal recipient has stated that he is actively transferring income earned through his BDD into real estate holdings and other businesses.

110.   Upon information and belief, top BDD recipients are brought to Jeunesse's home office where there are pitched on the inside deals by the Jeunesse leadership, specifically Wendy Lewis and Randy Ray, and are then presented with a BDD.

111.   According to one deal recipient, there are four individuals who work out of the Jeunesse home office and all they do is draft and execute BDDs.

112.   According to one Jeunesse Diamond Director, Jeunesse top earner, Defendant Jason Caramanis earns $1 million a month from Jeunesse by sitting in his home office and brokering BDDs all day long.  According to that Diamond Director, Defendant Caramanis no longer attends Jeunesse conventions and events.  Meanwhile, low level Jeunesse distributors

are routinely told by the Jeunesse leadership that their future success depends on their attending every Jeunesse event and bringing new recruits to these Jeunesse events.

113. One such deal recipient, who was struggling early on with his Jeunesse business, was told by Jason Caramanis to build his business based on the BDDs. When the deal recipient started doing so, he said his Jeunesse income climbed from $10,000 a month, to $80,000 a month and then to $100,000 a month. This $100,000 a month is based solely on income derived through the BDD and is in addition to income also earned through the Jeunesse Public Compensation Plan.

114. Through the Jeunesse Secret Compensation Plan (*i.e.*, BDDs) the deal recipient was able to enroll 30,000 distributors into Jeunesse in one-year alone. If each of those distributors "activated" and "qualified" by paying the $49.95 startup fee and by purchasing only the Basic Product Package at $199.95, then the income earned by Jeunesse based on just this one undisclosed BDD is approximately $7.5 million.

115. Upon information and belief, recipients of such deals include Jeunesse top earners Defendants Kim Hui, Jason Caramanis, and former VEMMA top earner, Alex Morton.

116. In or about July 2015, on the eve of the FTC bringing claims against VEMMA, upon information and belief, Alex Morton entered into a BDD with Jeunesse. Pursuant to that deal, he was advanced undisclosed sums in exchange for persuading his VEMMA "downline" to join Jeunesse. Within weeks, he was held out to the public as having achieved "Diamond Director" level without having met the requirements of the public plan, and without disclosing the existence or terms of the BDD. As a direct result of this fraudulent concealment, many Arizona residents were lured into the Jeunesse scheme.

117. Such deal recipients are routinely held out by Jeunesse as having achieved certain "levels" within the Jeunesse Public Compensation Plan (typically, Diamond Director), without disclosing the existence of the BDD, and thus fraudulently implying to the public that

1    such rapid success can also be achieved by distributors by building a business organization

2    through the Jeunesse Public Compensation Plan.

3           118.   Stated somewhat differently, recipients of Jeunesse's BDDs endorse Jeunesse

4    and the Jeunesse Public Compensation Plan without disclosing that they are being paid for

5    their endorsements through the BDDs.  That failure to disclose constitutes fraud.  According

6    to the Federal Trade Commission's Guide Concerning the Use of Endorsements and

7    Testimonials in Advertising, "[w]hen there exists a connection between the endorser and the

8    seller of the advertised product that might materially affect the weight or credibility of the

9    endorsement (*i.e.*, the connection is not reasonably expected by the audience), such

10   connection must be fully disclosed."  16 C.F.R. § 255.5 (1980).

11          119.   Jeunesse distributors who did not receive a BDD and did know about the BDDs

12   consider such endorsements, without disclosing the existence of the BDD, "material."  For

13   example, upon learning about the Diamond Director Cedric Harris' secret inside deal, one

14   individual stated:

15              Wow, this was sort of discouraging.  I have never been in MLM before but
16              signed up on Dec 24 and have worked my ass off and signed up 250+
                people in 10 weeks and now have a team of 650+…

17              I watched a team call the other night where Cedric [Harris] was announced
18              as making Diamond level in only TWO months!  I didn't realize you could
                be appointed that position… I don't even get any recognition for what I've
19              done and my sponsor sucks.

20              Wow.  That's all I can say.[17]

21          120.   At a closed-door meeting with members of his team, Jeunesse Diamond

22   Director, Adam Vincent Gilmer, explained that he built his sales organization, not through the

23   Jeunesse Public Compensation Plan, but on inside contracts and private deals (*i.e.*, BDDs):

24              The fastest way to build your sales organization is one, get in, and two,
25              structure your business so that you have contracts [*i.e.*, BDDs] on both
                sides of your business.  To put this in perspective, in the last two days [I

26   ─────────────────────────
[17] http://behindmlm.com/companies/90000-secret-backroom-affiliate-deals-jeunesse-lawsuit/

have] written about seventy $5,000 contracts…. I have built my business like this for the past three years and I've made incredible, incredible income in this company.

121.   Contrary to Jeunesse's public statements that average, everyday individuals can be successful in Jeunesse (if they simply have "passion") and that new recruits should not discriminate in who they introduce to the business ("Don't prejudge anyone"),[18] Adam Vincent Gilmer explained that he only sponsors what he calls "quality" individuals.  As he explained:  "I sponsor on purpose… I am very, very specific[.]"

122.   To become successful in Jeunesse, and contrary to Jeunesse's public statements that all you need is "two people, who then find two people, and so on," Adam Vincent Gilmer stated:  "There isn't anybody who sits in the rows that are Diamonds who haven't sponsored a hundred people and all of them on average make $1.6 million a year."

123.   This type of "head-hunting" activity conducted by Defendants and the Diamond Director Co-Conspirators is a direct violation of the Jeunesse Policy and Procedures, which provide:

> Distributors may not target the sales force of another direct sales company to become Distributors or to sell the products of Jeunesse.  Distributors may not encourage members of the sales force of another direct sales company to violate the terms of their contract with such company.  Distributors bear the sole risk and sole liability for such activities, which activities are not endorsed or supported by Jeunesse.

*See* Policies and Procedures (Ex. D), § 11.15.  Contrary to the express prohibition in the Jeunesse Policies and Procedures, Defendants and the Diamond Director co-conspirators support, endorse, and conduct such prohibited activities (indeed, its their primary business model).  Defendants and the Diamond Director co-conspirators are engaging in the wholesale importation of entire "teams" from other network marketing organizations into Jeunesse, all

---

[18] http://www.genyoungtraining.com/pages/skillset.php

the while never disclosing to those team members or to the public that the team leader endorsing, and enrolling them into, Jeunesse is the recipient of an inside deal (*i.e.*, BDD).

**E.    The Arbitration Provision in Jeunesse's Policy and Procedures is Procedurally and Substantively Unconscionable and Unenforceable.**

124.    Before becoming a Jeunesse Distributor, prospective distributors, including Plaintiff and members of the Class, are required to sign Jeunesse's Distributor Agreements, which incorporate the Jeunesse Global Policies and Procedures.  Buried in the back of the Jeunesse Global Policies and Procedures there is an arbitration provision.  The arbitration provision is provided on a "take-it-or-leave-it" basis with no opportunity for negotiation and is therefore a contract of adhesion.  The prospective distributor received no explanation of the arbitration provision and would not have been permitted to become a distributor unless they signed the Agreement that contains the offending, and unenforceable arbitration provision.  As a result of the unequal bargaining positions, the overall harshness of the adhesive arbitration provision, Jeunesse's arbitration provision is procedurally unconscionable.

125.    The Jeunesse Policies and Procedures provide:

**11.6 Arbitration**

All disputes and claims related to Jeunesse®, the Agreement, or its products, the rights and obligations of a distributor of Jeunesse®, or any claims or causes of actions relating to the performance of either a distributor or any Jeunesse® under the Agreement, and/or a distributor's purchase of product(s) shall be settled totally and finally by arbitration in Altamonte Springs, Florida, or such other location as Jeunesse® prescribes, in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association.  There shall be (1) arbitrator, an attorney by law, who shall have expertise in business law transactions, with preference being an attorney knowledgeable in the direct selling industry, selected from a  panel, which the American Arbitration Association approves.  Each party to the arbitration shall be responsible for its own costs and expenses of arbitration, including legal and filing fees.  If a distributor files a claim or counterclaim against Jeunesse®, a distributor shall do so on an individual basis and not with any other distributor or as part of a class action.  The decision of the arbitrator shall be final and binding on the parties and may, if necessary, be reduced to a judgment in

any court of competent jurisdiction. This agreement for arbitration shall survive any termination or expiration of the Distributor Agreement.

Notwithstanding the foregoing, the arbitrator shall have no jurisdiction over disputes relating to the ownership, validity or registration or any mark of other intellectual property or proprietary or confidential information of Jeunesse®, without Jeunesse's written consent. Jeunesse® may seek any applicable remedy in any applicable forum with respect to these disputes and with respect to money owing to Jeunesse®. In addition to monetary damages, Jeunesse® may obtain injunctive relief against a distributor in violation of the Agreement, and for any violation of misuse of Jeunesse's trademark, copyright or confidential information policies.

Nothing in this rule shall prevent Jeunesse® from terminating the Distributor Agreement or from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect Jeunesse's interests prior to filing of, or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding.

Nothing contained herein shall be deemed to give the arbitrator any authority, power, or right to alter, change, amend, modify, add to, or to subtract from any of the provisions of the Policies and Procedures, Rewards Plan, or the Distributor Agreement.

The existence of any claim or cause of action by a distributor against Jeunesse®, whether predicated on the Distributor Agreement or otherwise, shall not constitute a defense to Jeunesse® enforcement of the covenants and agreements contained in the Distributor Agreement.

*See* Policies and Procedures (Ex. D) § 11.6 (the "Arbitration Provision").

126. The Arbitration Provision is unenforceable for at least three independent reasons: (1) it is an illusory provision that Jeunesse has the power to modify at any time without notice; (2) it is also substantively unconscionable in that it lacks mutuality, and (3) it is procedurally unconscionable because it is foisted upon distributors without any opportunity to bargain, negotiate, or even be informed of the significance of the provision, and it purports to deny rights guaranteed by statute.

127.   The Arbitration Provision is illusory because the Policies and Procedures grant Jeunesse the power to unilaterally modify the Arbitration Provision, at any time, and without prior notice, thereby rendering the provision illusory, lacking in consideration and therefore unenforceable.

128.   Specifically, the Policies And Procedures provide:

> Jeunesse, at its discretion, reserves the right to amend the Policies and Procedures as set forth therein, its distributor or suggested retail prices, product availability and formulations, and Rewards Plan, as it deems appropriate without prior notice.

*See* Policy and Procedures (Ex. D), § 11.2.   Jeunesse's unilateral right to modify the Arbitration Provision renders the provision illusory and unenforceable.

129.   The Arbitration Provision is also unenforceable because it requires that distributors waive their right to a jury trial and access to the courts, but expressly reserves the right for Jeunesse to have access to the courts to seek any remedy:

> Nothing in this rule shall prevent Jeunesse … from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to safeguard and protect Jeuensse's interests prior to the filing of or during or following any arbitration or other proceeding or pending the handing down of a decision or award in connection with any arbitration or other proceeding.

*See* Policy and Procedures (Ex. D), § 11.6.   On the one hand, Jeunesse may have access to any and all courts in the United States to seek any remedy, either at law or equity, before a judge or an arbitrator; Jeunesse's ***distributors***, on the other hand, are precluded from accessing any Court or remedy other than through arbitration before the American Arbitration Association; this demonstrates the lack of mutuality in the Arbitration Provision.

130.   Further, Jeunesse's Arbitration Provision purports to restrict a distributor's right to bring a class action.   This class-action restriction further renders the arbitration provision substantively unconscionable, as it purports to deny distributors a statutory right.

1    131.   Because Jeunesse's Arbitration Provision is unconscionable, lacks mutuality,

2    and/or lacks consideration, the claims of Plaintiff and the Class are not subject to arbitration

3    and this action is properly before this Court.  Jeunesse cannot solicit and fraudulently induce

4    victims in Arizona for its illegal pyramid scheme and racketeering enterprise, and evade

5    redress for its violations under Arizona law by seeking to invoke this patently unconscionable,

6    illusory, and unenforceable Arbitration Provision.

7                                          **VI.**

8                    **PLAINTIFF'S CLASS ACTION ALLEGATIONS.**

9    132.   Plaintiff was induced to pay money to Jeunesse by numerous misrepresentations

10   (both explicit and by omission), including false claims that Jeunesse is a legitimate network-

11   marketing company and not an illegal pyramid scheme.  As the direct and proximate result of

12   such misrepresentations, plaintiff was damaged.

13   133.   This action is brought by Plaintiff as a class action pursuant to Federal Rule of

14   Civil Procedure 23.

15   134.   Plaintiff seeks relief on behalf of himself and a nationwide class of all persons

16   who were Jeunesse Distributors from September 9, 2009, until the present, and who suffered

17   damages as a result of Defendants' illegal pyramid scheme (the "Class").  Excluded from the

18   Class are the Defendants, their employees, family members, recipients of BDDs and all

19   affiliates who profited from the scheme.

20   135.   Plaintiff also seeks relief on behalf of himself and a subclass for the Arizona-

21   State law claims, which includes all persons who are members of the Class and who were or

22   are residents of Arizona (the "Subclass").

23

24

25

26

136.   The members of the class and the subclass number in the hundreds of thousands, if not millions,[19] and joinder of all Class members in a single action is impracticable.

137.   There are questions of law and/or fact common to the class and subclass, including but not limited to:

      i.    Whether Defendants are operating an unlawful pyramid scheme;

      ii.    Whether Distributors paid money to Defendants in exchange for (1) the right to sell a product and (2) the right to receive, in return for recruiting others into the program, rewards which were unrelated to the sale of the product to ultimate end users outside the distribution channel;

      iii.    Whether Distributors were required to make an investment into the pyramid scheme;

      iv.    Whether Defendants' conduct constitutes an illegal pyramid scheme under Arizona law;

      v.    Whether Defendants omitted to inform Plaintiff and the Plaintiff Class that they were entering into an illegal pyramid scheme where the overwhelming majority of Distributors lose money;

      vi.    Whether Defendants failed to disclose the existence of the BDDs to potential distributors who were not BDD recipients;

      vii.    Whether Defendants held out BDD recipients as having achieved level of success in Jeunesse without disclosing the existence of the BDD.

      viii.    Whether Defendants engaged in acts of mail and/or wire fraud in direct violation of RICO;

      ix.    Whether and to what extent the conduct has caused injury to Plaintiff and the Plaintiff class;

      x.    Whether Defendants' conduct constitutes an unlawful, unfair and fraudulent business practice under Arizona law.

---

[19] Jeunesse Chief Visionary Officer Scott Lewis stated at the Jeunesse University Hollywood Event held in early July, 2016:  "What I love about our system is we know that there are over 5,000 people joining this movement every single day."   Available at https://www.facebook.com/JeunesseHQ/

138.    These and other questions of law and/or fact are common to the Class and the Subclass, and predominate over any question affecting only individual class members.

139.    Plaintiff's claims are typical of the claims of the Class and the Subclass in that Plaintiff was a distributor for Jeunesse and lost money as a result of the Jeunesse pyramid scheme and Defendants' racketeering activity.

140.    Plaintiff will fairly and adequately represent the interests of the Class and the Subclass in that plaintiff's claims are typical of those of the Class and Plaintiff's interests are fully aligned with those of the Class. Plaintiff has retained counsel who is experienced and skilled in complex class-action litigation.

141.    Class-action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

142.    Plaintiff knows of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VII.

## CLAIMS FOR RELIEF

### COUNT I

**JUDGMENT DECLARING THE ARBITRATION PROVISION UNENFORCEABLE**
**(Nationwide Class)**

143.    Plaintiff re-alleges the foregoing paragraphs as though fully set forth herein.

144.    Jeunesse's Policies and Procedures contain an Arbitration Provision. The Arbitration Provision allows Jeunesse to unilaterally resort to the judicial process, while the distributor cannot. This lack of mutuality is unconscionable and unfair.

145.   Jeunesse's Policies and Procedures grant Jeunesse the power to unilaterally modify the terms of the Arbitration Provision at any time and without prior notice, thereby rendering the Arbitration Provision illusory, lacking consideration, and therefore, unenforceable.

146.   The Arbitration Provision purportedly prevents distributors from seeking relief as a class.   Accordingly, the Arbitration Provision's class action prohibition renders the Arbitration Provision substantively unconscionable.

147.   The Jeunesse Arbitration Provision also requires that distributors waive their right to a jury trial and access to the courts.   However, it reserves the right for Jeunesse to apply to any Court having jurisdiction for a writ of attachment, a temporary injunction, or any other relief available to Jeunesse to protect its interests prior to, during, or filing of any arbitration or other proceeding or pending the rendition of a decision or award in connection with any arbitration or proceeding.   In essence, Jeunesse may have access to the Courts to seek a remedy; however, distributors are precluded from receiving the same right, thus demonstrating a lack of mutuality in the provision.

148.   Accordingly, the Court should declare that the Arbitration Provision is procedurally and substantively unconscionable, illusory, lacking consideration, and unenforceable, and that the Plaintiff's claims and Class claims are properly before this Court.

## COUNT II

## RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. 1962(c)
### (Nationwide Class)

149.   Plaintiff re-alleges each of the preceding paragraphs as if fully set forth here.

150.   Each defendant is a "person" for purposes of RICO, 18 U.S.C. § 1962, because each defendant is, and was at all relevant times, an individual or entity capable of holding legal or beneficial interest in property.

1    151.   All of the Defendants in this action collectively form an "enterprise" under

2    RICO, 18 U.S.C. § 1962, in that they are a group of individuals and entities associated in fact,

3    although not a legal entity.

4    152.   In the alternative, the Jeunesse pyramid is an enterprise, in that it is an

5    association in fact of all Defendants and others which, although not gathered under any legal

6    entity, operates the illegal pyramid scheme to draw new investors to Jeunesse.

7    153.   The Defendants engaged in a pattern of racketeering activity by participating in

8    a scheme and artifice to defraud, in violation of the mail and wire fraud statutes: 18 U.S.C. §§

9    1341 and 1343.

10   154.   The Defendants' promotion of an illegal pyramid scheme is a *per se* scheme to

11   defraud under the mail and wire fraud statutes; thus, the Defendants have committed

12   racketeering acts by promoting an illegal pyramid scheme, by using and causing others to use

13   the mail and by transmitting and causing others to transmit, by means of wire in interstate

14   commerce, writing, signs, signals, pictures and sounds, all in furtherance of, and for purposes

15   of, executing a scheme or artifice to defraud, namely an illegal pyramid scheme.

16   155.   Each Defendant has promoted the Jeunesse pyramid.  Each use of the mail or

17   wire by the Defendants in furtherance of the Jeunesse pyramid is therefore an act of

18   racketeering.

19   156.   Moreover, the Defendants have used false and fraudulent pretenses to deceive

20   the plaintiff and the Class, and to thereby obtain money and property from the same. The

21   Defendants have engaged in materially misleading statements of facts, and nondisclosure of

22   particular facts, including:

23   A. Creating the false impression that the majority of investors in the Jeunesse

24   pyramid will profit from their investment by merely working hard and having

25   passion.

26   B. Creating the false impression that Jeunesse has a unique business model that is

1    unusually generous to investors.

2    C.  Failing to clearly disclose that the purported success and wealth achieved by the

3        individual Defendants through their participation in the Jeunesse pyramid is no

4        longer possible, and not due to a failure, or a lack of passion.

5    D.  Failing to disclose the existence of BDDs, and holding out BDD recipients as

6        obtaining certain levels of success in Jeunesse without disclosing that that

7        success was based on the BDD, not by organically growing the business

8        pursuant to the Jeunesse Public Compensation plan.

9    E.  These and other misrepresentations at the heart of the Defendants' enterprise

10       were reasonably calculated to deceive a person of ordinary prudence and

11       comprehension

12   157.   All of the Defendants acted with intent to defraud.

13   158.   The Defendants' numerous acts of mail fraud and wire fraud amount to a

14   pattern of racketeering activity because they are related and continuous. The pattern consists

15   of more than two acts, which occurred from 2009 until present, and consistently throughout

16   that period.  The predicate acts of mail and wire fraud are related because they have had the

17   same or similar purpose: to convince new investors to pay to join the Jeunesse pyramid by

18   paying money to do so, and to convince those investors to, in turn, recruit new investors. They

19   have the same result: convincing investors to join the Jeunesse pyramid by paying money and

20   having those investors recruit new ones to do the same. They have the same perpetrators:

21   Jeunesse's executives, co-founders, and Diamond Director Co-Conspirators; all of whom

22   promote the Jeunesse pyramid. They have the same victims: plaintiff and class members who

23   were fraudulently deceived into investing in the Jeunesse pyramid.  Finally, they have similar

24   methods of commission: fraudulent misrepresentations and omissions concerning numerous

25   aspects of Jeunesse's operations made via online presentations, telephone calls, in-person

26   gatherings, and written materials.  In short, the predicate acts of wire and mail fraud

committed by the Defendants constitute an intricately related set of predicate acts sufficient to meet the relatedness standard.

159.   Moreover, the predicate acts are continuous. They pose a threat of continued illegal conduct in that the Defendants continue to promote and operate the Jeunesse pyramid and have expressed their intention to continue to do so.  Additionally, the predicate acts have extended over a significant period of time — the nearly 7 years that Jeunesse has been in existence. The Defendants' regular business of attracting new Distributors is conducted by ongoing mail and wire fraud that misrepresents that Jeunesse is a legitimate multilevel marketing enterprise and not an illegal pyramid scheme.  Without the repeated acts of wire and mail fraud, the Defendants' fraudulent pyramid scheme would not be in existence.

160.   As a direct and proximate result of the Defendants' acts of mail and wire fraud, plaintiff and the class were injured in their business and property.  Each plaintiff was injured in his or her business or property by reason of the Defendants' pattern of racketeering activity, in that plaintiff surrendered valuable consideration of at least $250, and in most cases much more, in order to participate in the inherently fraudulent scheme promoted by the Defendants.

161.   Each enterprise alleged above was engaged in, or affecting, interstate commerce by reason of, at least, each of the Defendants' numerous acts or omissions constituting use of the mail or interstate wire communication facilities in furtherance of their scheme to defraud. Additionally, each enterprise affected interstate commerce because the members comprising it engaged in business in several states and made use of the mail and interstate wire communication facilities in the process of doing so by causing marketing and promotional materials for Jeunesse, as well as images, videos, and information to be communicated through regular mail and via the Internet.

162.   Each of the Defendants is employed by or associated with each enterprise above to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs

through a pattern of racketeering activity, *i.e.*, conducting the affairs of, promoting, and otherwise supporting the pyramid scheme.

163.    Specifically, Defendants Jeunesse, Wendy Lewis, Randy Ray, Scott Lewis, Kim Hui, Jason Caramanis, Alex Morton, and unnamed co-conspirators were involved in the creation and dissemination of marketing materials containing misrepresentations and material omissions regarding Jeunesse and have authorized the Diamond Director Co-Conspirators to direct conference calls, websites, web presentations and speeches that contain numerous misrepresentations and material omissions and that deceive people into participating in the Jeunesse pyramid.

164.    Pursuant to 18 U.S.C. § 1964, Plaintiff is entitled to recover treble damages, costs, and attorneys' fees.

## COUNT III

### RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. 1962(a)
### (Nationwide Class)

165.    Plaintiff re-alleges each of the preceding paragraphs as if fully set forth here.

166.    Revenue derived from the pattern of racketeering activity set forth above, which upon information and belief constitutes a significant portion of the Defendants' total income, was reinvested into the Jeunesse pyramid for at least the following purposes: (1) to expand the operations of the Jeunesse pyramid through additional false and misleading advertising and promotional materials aimed at recruiting new distributors in the Jeunesse pyramid; (2) to facilitate the execution of the Jeunesse pyramid; and (3) to convince existing Distributors in the Jeunesse pyramid to recruit new ones, resulting in harm to plaintiff and the class.

167.    Plaintiff and the class were injured in their business or property as a result of such reinvestment into the Jeunesse pyramid because they were induced, with funds used to establish new levels of the Jeunesse pyramid, to invest in Jeunesse.

168.    Pursuant to 18 U.S.C. § 1964, plaintiff and the class are entitled to recover treble damages, costs, and attorneys' fees.

1

2

3

## COUNT IV

## CONSPIRACY TO COMMIT RACKETEERING ACTIVITY IN VIOLATION OF 18 U.S.C. & 1962(d)
### (Nationwide Class)

4

169.  Plaintiff re-alleges each of the preceding paragraphs as if fully set forth here.

5

6

170.  The Defendants conspired to violate 18 U.S.C. § 1962(a) and (c) in violation of 18 U.S.C. § 1962(d).

7

8

9

10

171.  Each defendant knew about and knowingly and intentionally agreed to participate in and promote an illegal pyramid scheme. Specifically, the Defendants had a meeting of the minds on an object and course of action, namely, to create, support, and maintain the pyramid scheme for their own financial benefit.

11

12

172.  Each of the Defendants has committed multiple overt acts in furtherance of the unlawful objects of the pyramid scheme.

13

173.  The plaintiff and the class were injured in their business or property as a result.

14

15

174.  Pursuant to 18 U.S.C. § 1964, plaintiff and the class are entitled to recover treble damages, costs, and attorneys' fees.

16

## COUNT V

17

18

## INJUNCTIVE RELIEF UNDER 18 U.S.C. & 1964(a)
### (Nationwide Class)

19

175.  Plaintiff re-alleges each of the preceding paragraphs as if fully set forth herein.

20

21

22

23

24

25

176.  To prevent and restrain ongoing violations of 18 U.S.C. § 1962 by the Defendants, the court should order the Defendants to divest themselves of any interest, direct or indirect, in the enterprise; impose reasonable restrictions on the future activities or investments of the enterprise, including, but not limited to: prohibit the Defendants from engaging in the same type of endeavor as the enterprise engaged in, or order dissolution or reorganization of the enterprise.

26

## COUNT VI

## CONSUMER FRAUD (ARIZONA LAW)
### (Arizona Class)

177.   The Plaintiff re-alleges each of the preceding paragraphs as if fully set forth here.

178.   The false representations and omissions or failures to disclose material information by Defendants and the Diamond Director Co-Conspirators, as alleged herein, violated A.R.S. §§ 44-1521, *et seq*.

179.   Defendants are engaged in an illegal pyramid scheme as defined under A.R.S. § 44-1731.  Defendants utilize this illegal pyramid scheme to intentionally deceive consumers, in Arizona and elsewhere, and has caused injury to Plaintiff and members of the class, and real or potential injury to Arizona consumers.

180.   As a result and consequence, Plaintiff, and members of the class were injured, damaged and have suffered damages.

## VII.

## PRAYER FOR RELIEF

WHEREFORE**,** The named Plaintiff and the Plaintiff Class request the following relief:

A.   Judgment declaring Jeunesse's Arbitration Provision unenforceable;

B.   Certification of the Class;

C.   Jury Trial and judgment against the Defendants;

D.   Damages in the amount of the named plaintiff and the class's financial loss as a result of Defendants' conduct and for injury to plaintiff and the class's business and property, all as a result of Defendants violation of 18 U.S.C. § 1964(c);

E.   Permanent injunctive relief enjoining the Defendants from further unlawful,

unfair, fraudulent, or deceptive acts, including but not limited to, operating and supporting the Jeunesse pyramid;

F.   Restitution and disgorgement of monies;

G.   The cost and expense of suit, including reasonable attorneys' fees, in accordance with 18 U.S.C. § 1964(c);

H.   For general, compensatory, and exemplary damages in an amount yet to be ascertained, but in no event less than $250 million; and

I.   For such other damages, relief, and pre-and post-judgment interest that the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 28th day of July, 2016.

**DICKINSON WRIGHT PLLC**


By: s/ David N. Ferrucci
    David N. Ferrucci
    Jonathan S. Batchelor
    David G. Bray
    1850 North Central Avenue, Suite 1400
    Phoenix, Arizona 85004
    *Attorneys for Plaintiff*

PHOENIX 99998-1646 314029v2